**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| BRIAN A. MARTINELLI and PAUL GUERCIO, On Behalf of Themselves and All Others Similarly Situated, | : Civil Action No. |
| Plaintiff, | : **CLASS ACTION** |
| v. | : |
| FANDUEL, INC. and DRAFTKINGS, INC., | : **JURY TRIAL DEMANDED** |
| Defendants. | : |

---

## PRELIMINARY STATEMENT

1.     Plaintiffs Brian A. Martinelli and Paul Guercio (together, "Plaintiffs"), by and through their undersigned counsel, bring this action individually and as a class action on behalf of a nationwide class of all persons who participated in competitions operated by either FanDuel, Inc. ("FanDuel") or DraftKings, Inc. ("DraftKings") (together, "Defendants"), and on behalf of a subclass of all persons in the Commonwealth of Pennsylvania who participated in competitions operated by Defendants.

2.     Defendants operate competing daily fantasy sports ("DFS") services. As with traditional fantasy sports games, DFS participants ("players") compete against one another by selecting a team of professional athletes from a particular league or competition, and then earn points based on the actual statistical performance of their selected professional athletes in real-world sports competitions.

3.     DFS is an accelerated variant to traditional fantasy sports leagues that are typically played across an entire season, in which participants "draft" a team of professional athletes in a round-robin process, and then adjust their team's selection of

athletes throughout the course of the season.  By contrast, DFS is conducted over short-term periods, such as a week or single day of competition, and there is no round-robin draft or adjustments to one's team.

4.    Defendants structure their form of competitions (typically referred to as "contests"), in which participants (*e.g.*, Plaintiffs and other class members) place wagers, styled as "fees" to participate, and build a team of professional athletes in a certain sport while complying with a salary cap.  Defendants told participants that depending on their overall performance, they may win a share of a pre-determined jackpot.  Plaintiffs' entry fees helped to fund the prizes, while Defendants took a portion of the entry fee as "rake-off revenue."  Rake-off revenue constitutes Defendants' primary sources of revenue, ranging from about 6% to more than 14% of the jackpot.

5.    Collectively, Defendants all but control the DFS industry in the United States.  New York-based FanDuel and Boston-based DraftKings were established as venture capital-backed startup companies, received funding from investment firms, sports broadcasters, leagues, and team owners, and, as of September 2015, have an estimated net worth of at least $1 billion, and control 95% of the DFS market in the United States.

6.    Defendants cast their website-based contests as games of skill, not games of chance.  For example, DraftKings' website maintains that DFS "is a skill game and is not considered gambling."  FanDuel's website maintains that DFS "is considered a game of skill and, therefore, legal."  By asserting such claims, Defendants seek to avoid the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. § 5361 *et seq.*, which expanded the mechanisms available to federal prosecutors seeking to enforce anti-gambling laws against internet-based gambling companies.  This statute primarily

introduced new consequences for financial institutions that process illegal gambling transactions.

7.     In reality, Defendants' games are neither games of skill nor games of chance. Rather, they are games that are rigged. On or around September 27, 2015, DraftKings employee Ethan Haskell ("Haskell") received an Excel file containing DraftKings aggregate player ownership percentages for National Football League ("NFL") fantasy competitions that weekend. This non-public information ("inside information") — revealing which professional athletes were on the most DFS rosters—provided Haskell with a complete understanding of exactly which way the DFS crowd was leaning that weekend. As explained below, such information is extremely valuable before lineups lock in a DFS contest, and is why it is (supposedly) kept under wraps.

8.     Haskell inadvertently published the data on a forum post on the daily fantasy sports community site RotoGrinders.com. [citation] That same weekend, armed with this inside information, Haskell played on FanDuel and, against all odds, finished second out of 229,885 entrants in the "$5M NFL Sunday Million" competition, and cashed in on a second place $350,000 jackpot.

9.     On October 5, 2015, *The New York Times* published an expose titled "Scandal Erupts in Unregulated World of Fantasy Sports," reporting on Haskell's extraordinary winning, questioning whether Defendants' employees were placing bets using inside information not available to the public, and noting that a spokesman for DraftKings "acknowledged that employees of both companies had won big jackpots playing at other daily fantasy sites."

10.     Haskell has had, by all accounts, extraordinary success playing FanDuel

over the past year. According to the website larrybrownsports.com, Haskell's profile shows that he won three first place finishes in FanDuel Major League Baseball games in just the month of October 2015, including first place out of: (i) 1,810 entrants on August 1; (ii) 5,747 entrants on August 10; and (iii) 12,889 entrants on August 18. Haskell's winnings in the month of October 2015 totaled hundreds of thousands of dollars, followed by hundreds of thousands more in September 2015.

11.     On October 6, 2015, the Office of the New York Attorney General ("NYAG") opened an investigation into Defendants' operations and the use of inside information. Reports soon emerged indicating that various other federal and state enforcement agencies and regulators were probing the operations of the two companies. On October 15, 2015, *The Wall Street Journal* reported that the U.S. Justice Department and the Federal Bureau of Investigation were probing Defendants' businesses.

12.     On November 17, 2015, the NYAG filed separate complaints against Defendants alleging nine causes of action, including, *inter alia*, running a book-making or other kind of gambling business; knowingly advancing and profiting from unlawful gambling; illegal wagering; "repeated and persistent fraudulent conduct"; "deceptive acts and practices"; and "false advertising."

13.     At all times relevant herein, Defendants communicated to Plaintiffs and class members that their respective employees were banned from playing on their own websites, but fraudulently, recklessly, and/or negligently failed to disclose and otherwise omitted the material fact that they were permitted to participate and bet on competitor sites and that employees of competitor sites were permitted to play on theirs..

14.     Defendants also failed to disclose that their respective employees with

4

access to inside information, including private internal company statistics and analytics, were winning large sums of money on other competitor sites, and employees of competitor sites were winning large sums of money on theirs.

15.     At all relevant times, Defendants materially misrepresented that their contests were fair games of skill when, in fact, individuals with inside information were playing with an advantage and winning.

16.     Plaintiffs collectively deposited approximately $2,500 on Defendants' websites to participate in tournaments and contests. In doing so, Plaintiffs suffered a loss. But for Defendants' material misrepresentations and omissions, Plaintiffs and the class members would not have deposited money on Defendants' sites.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) (Class Action Fairness Act) in that this is a putative class action with more than 100 class members, those members' claims exceed $5,000,000 in the aggregate, and the requisite diversity of citizenship is present, as Plaintiffs are citizens of a State (Pennsylvania) that is different from at least one Defendant.

18.     This Court has personal jurisdiction over FanDuel because its principal office is located in New York, NY, and has personal jurisdiction over DraftKings because DraftKings conducts substantial business in New York and this District, and otherwise has sufficient minimum contacts with New York and this District through advertising, promotion and consumer use of its DFS website and online tournaments and contests, thus rendering the exercise of personal jurisdiction by this Court to be proper and necessary.

19.     Venue is appropriate pursuant to 28 U.S.C. § 1391. A substantial portion

of the events and conduct giving rise to the violations alleged in this complaint occurred in this District. Additionally, New York-based FanDuel maintains its principal office and headquarters in this District.

## PARTIES

20.     Plaintiff Brian Martinelli ("Martinelli") is a citizen of Pennsylvania. Martinelli deposited money into accounts of FanDuel and DraftKings websites in order to participate in the so-called games of skill, and lost money as a result of Defendants' unfair and/or deceptive conduct alleged herein.

21.     Plaintiff Paul Guercio ("Guercio") is a citizen of Pennsylvania. Guercio deposited money into accounts of FanDuel in order to participate in the so-called games of skill, and lost money as a result of FanDuel's unfair and/or deceptive conduct alleged herein.

22.     Defendant FanDuel is a Delaware corporation with its principal place of business at 19 Union Square West, 9th Floor, New York, NY 10003.

23.     Defendant DraftKings is a Delaware corporation with its principle place of business at 225 Franklin St., 26th Floor, Boston, MA 02110.

## STATEMENT OF FACTS

### A.     Background of DFS

24.     DFS is a non-regulated industry wherein Defendants operate web-based tournaments in which participants (e.g., Plaintiffs and class members) compete in fantasy sports games that are held on a daily basis. Participants select their fantasy sports teams that accumulate points based on actual statistics of real-life athletes on professional sports teams who are competing in sporting events taking place on a particular day.

25.     Participants select a line-up of players at certain positions until they reach a "salary cap" for their team, and then enter tournaments with entry fees as low as $0.25 and as high as $5,300.  Players whose fantasy teams score the most points—based on the real-life statistical performance of those athletes selected in that DFS contest—win the most money.

26.     DFS has become big business, and Defendants have generated incredible revenue by attracting millions of users to their otherwise unregulated websites.  For example, FanDuel reportedly cleared $57.3 million in revenue on $621.7 million in player entry fees in 2014, beating 2013's top line of $14.3 million on $159.4 million in entry fees. Reflecting a similar trend, DraftKings revealed that in 2014 the company received $304 million in player entry fees, compared to the $45 million in entry fees it collected in 2013. Additionally, DraftKings reports $40 million in revenue in 2014 compared to $3 million the previous year.  According to a September study by Eilers Research LLC, DFS is projected to see $3.7 billion in entry fees in 2015.  Eilers said that number is expected to reach $17.7 billion by 2020.

27.     Defendants increased their growth in 2015 by spending a combined more than $100 million on television advertising at the start of the 2015 NFL season.  In doing so, they became two of the top television advertisers in the United States.  According to Legal Sports Report, in late summer just ahead of the start of the 2015 NFL season, DraftKings was averaging a commercial every 90 seconds.

28.     As a result of their advertising bombardment, Defendants added millions of new users.  During the first weekend of the NFL season, Defendants took in $60 million in entry fees, double the amount of bets placed in Las Vegas.

29.     Defendants have sought to avoid regulatory oversight by marketing DFS as games of skill, not chance.  DFS claims this exemption under the UIGEA, which does not apply to "participation in any fantasy or simulation sports."  *See* 31 U.S.C. § 5362.  UIGEA was passed long before the creation of daily fantasy games, which feature entry fees and cash prizes in the millions of dollars.  Such supposed exemption has allowed FanDuel and DraftKings, founded in 2009 and 2011 respectively, to grow to billion-dollar valuations without the regulation required of Nevada casinos and sports books.  Calls for more legal safeguards increased when the two companies launched competing advertising campaigns to coincide with the start of the 2015 NFL season.

30.     To avoid characterization as gambling websites, Defendants market DFS as a game of skill, like the stock market or chess, holding themselves out to Plaintiffs and class members as places where skill makes the difference between winning and losing.  For instance, in a television commercial that ran in August 2015, DraftKings advertised that "every week, use your knowledge and showcase your skills. . . . you like football, you like winning."

31.     In another commercial that began to run in August 2015, DraftKings advertised its website as "a game within the game, that requires a different set of skills . . . we don't just play, we are players, we train, and we win."  Similarly, FanDuel advertised that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

32.     Defendants have sought to avoid being labeled as gaming industry participants by promoting the supposed skill involved in picking a winning team.  According to DraftKings Chief Executive Officer ("CEO") Jason Robins ("Robins"),

DraftKings attracts players "who are analytical and favor data and research." Robins went on to say: "They do their homework. It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."

33.     In reality, the overwhelming majority of prizes on Defendants' sites has and continues to go to a handful of individuals with top DFS scores. An analysis of publicly available data by *Sports Business Daily* found that, in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players. Similarly, a *Bloomberg* analysis showed an analogous distribution heavily weighted towards the top 1% of players.

### B.     The Undisclosed Use of Inside Information to Plaintiffs' Detriment

34.     The greatest advantage any DFS player can attain comes in the form of securing fantasy sports data and information not available to the players from the public at large. DraftKings and FanDuel employees maintain access to both statistics and analytics, neither of which is public information. For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain playing strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests. DraftKings is aware of the value of this data and knows that it should not be shared. As stated by CEO Robins:

> The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing... That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently. And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."

35.     Robins went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."

36.     In addition to years of data on optimal strategies (which gives Defendants' employees a huge advantage over even the most "skilled" DFS players), Defendants' employees also maintain real-time access to data on currently entered lineups of every player in every contest, and the overall ownership percentages of every player.

37.     Defendants also set player pricing through particular proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

38.     Because the goal is to outscore other DFS contestants, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many regards, including the ability to create a unique DFS roster with enough professional athletes different from competitors' rosters. Specifically, the reason that information is valuable is one could see who is not picked. Those who finish at the very top of a fantasy contest often owe their success to picking wildly successful players who few other users picked, so knowing who was not picked can open the door to huge gains that other miss out on.

39.     DraftKings were aware that its employees were playing on the FanDuel website and some made more money from their DFS winnings than their DraftKings employment salaries. FanDuel, too, is aware of their employees playing on other DFS sites, and even went so far as to profile one of its own employees who had won $50,000 in

DFS winnings over a short period of time.

40.     CEO Robins admitted that he "had reservations" about allowing DraftKings' employees to play on other DFS sites and allowing other DFS sites' employees to play on DraftKings' site, and even spoke to his competitors about ending the practice. Robins stated: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place." Robins admitted further that numerous employees have access to data that could give them an advantage, including customer service and engineering workers. Ultimately, however, it was decided in concert with other DFS providers to continue to permit such employee play.

41.     On a Rotogrindres.com blog, Robins had previously discussed preventing fraud which could affect "game integrity." Ironically the first person to respond was the employee who won $350,000 on a competitor's website, as discussed below:





42.    In that post, Robins uses the word "fraud" or "fraudster" nine times. Robins

also discussed how sophisticated DraftKings data analysis and fraud prevention efforts

were, including tracking users by their Internet Protocol or IP addresses. Thus, DraftKings

could monitor users who worked for FanDuel or other sites to determine their winnings

and whether there existed the possibility and likelihood that they were using inside information.

43.     For instance, an analysis by DFS Report (an online publication dedicated to the DFS industry) shows that an employee at FanDuel who works in product operations is one of the top 50 players in all of DFS, despite only playing on one site. While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on another DFS site. One of his jobs includes setting player prices, which gives him access to daily detailed information about pricing models which could help him identify inefficiencies or opportunities on other DFS sites.

44.     According to *Legal Sports Report* ("LSR"), an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)" Indeed, FanDuel's CEO has admitted to personally playing on competitor sites.

C.     **A DraftKings Employee Inadvertently Posts Inside Information and Then Wins $350,000 on FanDuel**

45.     On or around September 27, 2015, Haskell, a DraftKings employee, posted online DraftKings' confidential and proprietary statistics before they were supposed to be made available to the public – that is, before all of the participant contestants' lineups were "locked" and could therefore still be changed. The statistics showed the rates at which professional athletes had been selected in DraftKings' "Millionaire Maker" fantasy contest for the third week of the NFL season and could have given late entrants, or those making

13

last-minute changes, an edge over competitors who had already submitted rosters.

46.     On the same day he posted the statistics, Haskell finished second in a related FanDuel contest that had almost 23,000 entrants, winning $350,000.   Haskell initially claimed in his online post that he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."

47.     An analysis of Haskell's previous DFS history shows a remarkable increase in his winnings since joining DraftKings.   Haskell's LinkedIn profile indicates that he has been with DraftKings since June 2014.   According to Larrybrownsports.com, Haskell's Rotogrinder profile lists his 100 best game results as follows: 83 from FanDuel between October 2014 and October 2015 (all but 5 came in 2015); 10 were from Fantasy Feud, all between April-July 2015; 6 from DraftKings, all between November to December 2013 before he worked for DraftKings; and 1 from DraftStreet in November 2013.   In other words, the majority of his best performances occurred when having access to DraftKings' confidential information that reveals other player's lineups and other inside company statistics and analytics.

48.     In all, DraftKings employees have won at least $6,000,000 playing at FanDuel, which averages more than one million dollars per year considering DraftKings is only a few years old.   The ability of FanDuel to calculate that information shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing and what the possibility is that other DFS employees are using non-public inside strategic information..

### D.     The NYAG Commences Investigation

49.     On October 6, 2015, *The New York Times* reported that the NYAG

commenced an investigation into the prospect that Defendants' employees have won lucrative payouts based on inside information not available to the public. The investigation required the Defendants to turn over a range of internal data and details on company internal controls and the prevention of fraud.   Defendants have since barred their employees from participating in DFS games.

50.    On October 14, 2015, the FBI launched an investigation into Defendants' DFS services following the break of the inside information scandal.

51.    On November 10, 2015, the NYAG issued a cease-and-desist order to Defendants, arguing that DFS contests were illegal under New York state law and ordering the DFS providers cease servicing residents of New York.  He stated that DFS "wagers" represented "wager[s] on a 'contest of chance' where winning or losing depends on numerous elements of chance to a 'material degree.'"  He went on to characterize the DFS industry as being a "massive, multi-billion-dollar scheme intended to evade the law and fleece sports fans across the country," causing the "same public health and economic problems associated with gambling, particularly for populations prone to gambling addiction and individuals who are unprepared to sustain losses, lured by the promise of easy money."

52.    On November 17, 2015, the NYAG filed a request for a temporary injunction to force Defendants to cease servicing New York customers.  In the filing, the NYAG alleged that DFS was merely a "re-branding" of sports betting.  In response to claims that DFS contests constitute a game of skill, he argued that "a few good players in a poker tournament may rise to the top based on their skill; but the game is still gambling." The NYAG also acknowledged that the two DFS providers had "basic compliance issues"

(alluding to the inside information scandal), had associated themselves with gambling-oriented entities, and DraftKings in particular had accepted entry fees from users in states where DFS was illegal. FanDuel stated that it would comply with the order and restrict participation by residents of New York, while DraftKings stated that it would continue to provide them DFS services, arguing that the NYAG's decision was based on an "incomplete understanding of the facts about how our business operates and a fundamental misinterpretation and misapplication of the law."

53.     Had Plaintiffs and class members known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiffs and members of the proposed classes would not have participated in games that Defendants sponsored.

54.     Had Plaintiffs and class members known that Defendants had acted in concert to sanction the practice of allowing employees of DFS sites to play against them, Plaintiffs and members of the proposed classes would not have played on Defendants' websites.

55.     In total, Plaintiffs deposited approximately $2,500 on DraftKings and FanDuel before the disclosure of the fact that DFS employees were playing with inside information. In doing so, Plaintiffs suffered a loss of these deposited funds, or a portion thereof, and thus sustained damages.

56.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

57.     DraftKings and FanDuel both communicated to their customers that their

16

company employees were not permitted to play on their own sites, but omitted the material fact that they were allowed to play on other sites, and that other sites' employees were allowed to play on their respective sites.

58.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their respective sites.  However, the harm and financial loss had already been inflicted upon Plaintiffs and the proposed classes.  Such harm has not been redressed.

**F.     Invalidity of Arbitration Provision of Terms of Use**

59.     DraftKings' Terms of Use and FanDuel's Terms of Use are not valid, enforceable contracts.

60.     Plaintiffs and the Classes (defined further herein) were fraudulently induced into placing, depositing, and/ wagering money on DraftKings and FanDuel's websites under the assumption that the DFS contests provided were fair games of skill without the potential for insiders to use non-public information to compete against them with an advantage.

61.     The Defendants' so-called "Terms of Use" do not constitute valid, mutual agreements because the promises made by DraftKings and FanDuel are illusory.  Indeed, there is no restriction on DraftKings' or FanDuel's ability to terminate the "agreement" or to refuse to perform.  As such, no real contractual obligation was accepted by Defendants.

62.     For example, DraftKings' so-called "Terms of Use" provides that DraftKings and related individuals, such as company officers and directors, are released from any liability for any claim by the user "whatsoever": "By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify,

17

release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to . . . [examples of various types of liability listed]."

63.     Similarly, FanDuel's Terms of Use states: "You agree to release and to indemnify, defend and hold harmless FanDuel and its parents, subsidiaries, affiliates and agencies, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities, from and against any and all losses, liabilities, expenses, damages, costs (including attorneys' fees and court costs) claims or actions of any kind whatsoever arising or resulting from your use of the Service, your violation of these Terms of Use, your receipt, ownership, use or misuse of any prize, and any of your acts or omissions that implicate publicity rights, defamation or invasion of privacy.  FanDuel reserves the right, at its own expense, to assume exclusive defense and control of any matter otherwise subject to indemnification by you and, in such case, you agree to cooperate with FanDuel in the defense of such matter."

64.     Another reason why DraftKings' so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendants the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

65.     Yet another reason why DraftKings' so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke

any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

66.     The Terms of Use of DraftKings purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision in that "[a]ny claim or dispute between [customer] and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

67.     Similarly, the Terms of Use of FanDuel state: "The failure of FanDuel to exercise or enforce any right or provision of the Terms shall not constitute a waiver of such right or provision.  If any provision of the Terms is found by an arbitrator or court of competent jurisdiction to be invalid, the parties nevertheless agree that the arbitrator or court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Terms remain in full force and effect."

68.     In addition, a DraftKings or FanDuel user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

69.     In addition, the arbitration provision is unenforceable as it did not clearly and unambiguously signal to plaintiffs that they were surrendering their rights to pursue their statutory claims in court or have a jury decide the dispute.

70.     The Terms of Use are procedurally and substantively unconscionable.

71.     As a direct and proximate result of the actions described herein, Plaintiffs and members of the proposed classes have been damaged.

## CLASS ALLEGATIONS

72.     Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The Nationwide Class and Subclasses (together the "Classes") that Plaintiffs seek to represent are defined as follows:

> **Nationwide Class:** All persons who are citizens of the United States and have paid, placed, deposited, submitted, risked, and/or invested funds into Defendants' websites to play in their DFS contests.

> **Pennsylvania Subclass:** All persons who incurred damages in the Commonwealth of Pennsylvania who have paid, placed, deposited, submitted, risked, and/or invested funds into Defendants' websites to play in their DFS contests.

73.     Excluded from the proposed Classes are: (i) Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; and (ii) any member of the immediate families of excluded persons.

74.     Members of the Classes are so numerous that joinder of all members is impracticable. The Classes are made up of hundreds or thousands of members. The precise number of class members can only be ascertained through discovery, which includes Defendants' membership and financial records. The disposition of their claims through a class action will benefit all parties and this Court.

75.     There is a well-defined community of interest in the questions of law and fact involved affecting Plaintiffs and members of the Classes.

76.     The questions of law and fact are common to the Classes and predominate over questions which may affect individual members. They include the following:

a.   Whether Defendants, their directors, officers, and/or employees, made

false, deceptive, unfair, and/or misleading statements or representations to Plaintiffs, class members and/or the public at large;

b. Whether Defendants, their directors, officers, and/or employees, released false, deceptive, unfair, and/or advertisements to Plaintiffs, Class members and/or the public at large;

c. Whether Defendants permitted their employees to play on competitor DFS sites using their own company's non-public inside DFS information or analytics to gain a competitive player advantage; whether Defendants acted in concert to condone this practice, or whether it was the result of negligent management; and whether Defendants were aware of this practice and could and/or should have disclosed this to Plaintiffs and the Classes;

d. Whether Defendants, their directors, officers, and/or employees, owed duties of reasonable care to impart correct and reliable disclosure to Plaintiffs, class members and the public at large regarding the nature of the contests and competition, the degree of the contests' fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees to play on competitor DFS websites;

e. Whether Defendants' false, deceptive, or misleading representations caused Plaintiffs and members of the Classes to pay, place, deposit, submit, risk, and/or invest funds into Defendants' websites to play in their DFS contests;

f.  Whether and to what extent Plaintiffs and members of the Classes were injured by Defendants' false, fraudulent, deceptive, misleading, and/or negligent representations or other actions;

g.  Whether the alleged contracts between the parties, and specifically their Terms of Use and Arbitration clauses, are legally binding or invalid and unenforceable because they are unconscionable, illusory, fraudulent, or otherwise legally void; and

h.  Whether Defendants, their directors, officers, and/or employees were unjustly enriched at the expense of Plaintiffs and members of the Classes.

77.  Claims and defenses of Plaintiffs, as the representative Plaintiffs, are typical of the claims and defenses of the Classes because Plaintiffs and the members of the Classes all paid, placed, deposited, submitted, and/or invested funds into Defendants' websites to play in the contests provided by Defendants. Defendants' conduct and representations caused Plaintiffs, like all members of the Classes, to pay, place, deposit, submit, risk, and/or invest funds into Defendants' websites to play in their contests based on representations by Defendants that their contests were fair games of skill, that Defendants' maintained in their contests an even-level playing field, and that all customers permitted to play had equal access to same set of DFS data and sports information and analytics. For the same or similar reasons, Plaintiffs' claims are also typical of those of the subclass.

78.  Plaintiffs, as the representative Plaintiffs, will fairly and adequately assert and protect the interests of the class as Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the class;

22

and Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action.

79.     With respect to Class and/or subclass, questions common to the class predominate over those which only affect individual DFS players. This case involves the same breach of integrity and fairness as to all DFS contests on Defendants' DFS websites. The same fraudulent representations and inducement were employed for all members of the Class, regardless of which DFS contest was played by each individual class member. Liability will primarily be predicated upon the jury's evaluation of Defendants' misrepresentations, the breach of fairness to Defendants' DFS contests, and Defendants' awareness of and company policies regarding whether Defendant employees maintained access to their company's confidential DFS player information and could use that information to play on competitor DFS sites.

80.     A class action provides a fair and efficient method for the adjudication of controversy for the following reasons:

a.   The common questions of law and fact set forth above predominate over any questions affecting only individual class members;

b.   The class is so numerous as to make joinder impracticable. The class, however, is not so numerous as to create manageability problems. There are no unusual legal or factual issues which would create manageability problems;

c.   Prosecution of a separate action by individual members of the class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible-standards' of conduct;

    d. The claims of the individual class members are small in relation to the expenses of litigation, making a class action the only procedure in which class members can, as a practical matter, recover; and

    e. A class action would be superior to and more efficient than adjudicating thousands of individual lawsuits.

## COUNT I
## AGAINST DEFENDANTS FOR NEGLIGENCE

81.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

82.    As DFS providers to the public, Defendants owed duties to Plaintiffs and the proposed classes as users and paying customers of their sites to use reasonable care to provide true, reliable, fair and safe DFS services and platforms.

83.    Defendants breached their duties to Plaintiffs and the proposed classes by failing to reasonably prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiffs and the proposed classes with an unfair competitive advantage.

84.    In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied materially false and incomplete information to Plaintiffs, the proposed classes regarding the fairness of their DFS contests and safety and security of their submitted data.

85.    Plaintiffs and the proposed classes justifiably relied upon the false and misleading information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money in their DFS contests which were unfair and unsecure.

86.    Defendants failed to use reasonable care in communicating the information

24

about safety and security of player data, employee access to that data and ability of employees to use material, non-public data to compete against Plaintiffs and the proposed classes on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and the proposed classes competed.

87.     Defendants failed to use reasonable care in preventing company and competitor employees from accessing private player data and/or using that data and other non-public inside DFS information, statistics, and analytics to compete against Plaintiffs and the proposed classes on their websites and/or other DFS websites with an unfair competitive advantage.

88.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the proposed classes suffered financial loss and damages.

## COUNT II
## AGAINST DEFENDANTS FOR FRAUD AND MISREPRESENTATION

89.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

90.     Defendants made material representations that were false, that Defendants knew were false or reckless as to their veracity, and made with the inducement for Plaintiffs and the class to act upon.

91.     Specifically, and as detailed herein, Defendants represented that their contests were fair games of skill.  Defendants willfully failed to disclose that their employees, agents, owners and/or others with non-public information, data and access to Plaintiffs and the proposed classes' submissions would use this information to compete against Plaintiffs and the proposed classes to maintain a competitive advantage and increase their chances of winning, thereby greatly decreasing Plaintiffs and the classes'

ability to use skill to win.

92.     Plaintiffs and the proposed classes acted in reliance on the false, material representations and omissions made by Defendants, which caused them financial loss and injury.

93.     Plaintiffs and the proposed classes would not have deposited money or engaged in any DFS play on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

94.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiffs and the proposed classes to pay, place, deposit, submit, and/or invest funds exchange for DFS services and agreeing to the alleged contract.

95.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiffs and the proposed classes were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

**COUNT III**
**AGAINST DEFENDANTS FOR VIOLATION OF THE PENNSYLVANIA**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

96.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

97.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 – 201-9.3., was enacted to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services.

98.     73 P.S. § 201-2(4)(xxi) prohibits engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

26

99.     73 P.S. § 201-3 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

100.    Defendants are in the business of marketing, selling and promoting services in Pennsylvania through television advertising, radio and internet advertising. Defendants directly marketed, targeted and with the intent to reach Pennsylvania consumers, including Plaintiffs and the proposed classes.

101.    Plaintiffs and the proposed classes are in privity with Defendants.

102.    Defendants' actions as described herein are false, misleading, deceptive and/or unconscionable, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.   As set forth herein, Defendants have represented that their services have characteristics, including that of fairness, which they do not in fact maintain, and have represented that their services are of a particular standard which they have evidently fallen short of.

103.    Plaintiffs and the proposed classes have purchased or leased services primarily for personal purposes and have been damaged as a direct and proximate result of Defendants' violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  Plaintiffs and members of the proposed classes are entitled to recover actual damages suffered (or $100, whichever is greater), and are entitled to up to three times actual damages sustained and other equitable relief pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

## COUNT IV
## AGAINST DEFENDANTS FOR CIVIL CONSPIRACY

104.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

105.   As detailed herein, the Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to commit an unlawful act or business practice, and continued to act in concert after the act was discovered.

106.   Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiffs and the proposed classes, Defendants committed negligence and/or fraud.

107.   This overt act was done pursuant to or in furtherance of Defendants' conspiracy to allow their employees and officers to profit, to continue to attract new players to their websites, and otherwise profit because of their unlawful activities.

108.   FanDuel was aware that its employees played on DraftKings.

109.   DraftKings was aware that its employees played on FanDuel.

110.   Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and outscore players on other DFS sites, including Plaintiffs and members of the classes.

111.   As a direct and proximate result of Defendants' concerted actions, Defendants are also liable to Plaintiffs and the members of the proposed classes.

**COUNT V**
**AGAINST DEFENDANTS FOR UNJUST ENRICHMENT**

112.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

113.   Plaintiffs and the members of the proposed classes conferred a benefit on Defendants by depositing money and playing in contests on their websites.

114.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the members of the proposed classes deposits and contest entry fees,

whose retention under these circumstances was unjust and inequitable because Defendants misrepresented the facts concerning the fair play available in their DFS contests.

115.    Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid entry fees for contests and deposited money onto Defendants' websites, which they would not have done had they known the truth about Defendants' operations.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and the members of the proposed classes is unjust and inequitable, Defendants should be required to pay restitution to Plaintiffs and the members of the proposed class for their unjust enrichment, as ordered by the Court.

### COUNT VI
### AGAINST DEFENDANTS FOR VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES LAW (N.Y. GEN. BUS. § 349, et seq.)

116.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

117.    By the acts and conduct alleged herein (i.e., making the above-described misrepresentations), Defendants committed unfair or deceptive acts and practices in the State of New York.

118.    The foregoing acts, practices, and representations were directed at consumers, DFS players and/or potential DFS players who might use Defendants' websites and compete in Defendants' DFS contests.  This also remains the case when such acts, practices, and representations were directed at the media or non-consumer individuals who do not compete in DFS contests as provided by Defendants.  In all situations, Defendants' deceptive acts, practices, or representations were consumer-oriented, at or about their DFS contests as provided and made available to the consumer public.

119.    The foregoing deceptive acts and practices were misleading in a material way because they fundamentally misrepresented the nature of Defendants' DFS contests, the nature of the competition within, the degree of fairness and level playing field maintained, and the extent of inside, non-public information available to certain of the DFS players competing on their sites.

120.    Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349, which caused Plaintiffs and Class members injury and damage as they joined and paid, placed, deposited, submitted, risked, and/or invested funds into Defendant' websites, which they would not have done had they known the true facts and/or not been misled.

121.    Plaintiffs and members of the proposed classes were also injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 in that their ability to fairly compete and win cash prizes on an even playing field was adversely impacted, and they, statistically, won less money as a result.

122.    By virtue of Defendants' misrepresentations and willful omissions, Plaintiffs and members of the proposed classes have suffered damages.  Accordingly, Plaintiffs and members of the proposed classes seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees and costs.

## COUNT VII
## AGAINST DEFENDANTS FOR VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW (N.Y. GEN. BUS. § 350, et seq.)

123.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

124. By the acts and conduct alleged herein, Defendants committed false advertising in the conduct of business, trade or commerce in the State of New York contrary to the New York False Advertising Law, G.B.L. § 350, et seq.

125. "False advertising" is defined as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The foregoing acts and practices were directed at consumers. G.B.L. § 350-a.

126. In an effort to increase business and, specifically, the volume of players and company profits from paying customers using their DFS websites to engage in DFS play, Defendants, in the course of their business, targeted sports fans and the potential DFS players from the public at large with false and misleading advertisements on television and other platforms.

127. Defendants' advertisements were and continue to be false and misleading in a material way because they fundamentally misrepresent the fair play and even-level playing field available for all DFS players on their websites. Moreover, Defendants' advertisements were false and misleading in a material way because they failed to reveal to their viewers that Defendants' employees (some of whom had access to non-public DFS player information and strategies) were permitted to play in DFS contests on competitor company DFS websites. As a result of Defendants' representations regarding the fairness of their contests and the degree to which a player's skill and knowledge of the relevant sport would determine the contests' winnings, the advertisements and their omissions were materially misleading.

128. Plaintiffs and members of the proposed classes were injured as a direct and

proximate result of Defendants' violation of the New York False Advertising Law because they paid for entry into contests and deposited money onto Defendants' websites which they would not have done had they known the true facts.

129.     Plaintiffs and members of the proposed classes were also injured in that their DFS cash prize winnings were statistically lowered as a result of Defendants' employees playing with non-public and insider information on competitor company DFS websites.

130.     Plaintiffs and the proposed classes seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.   Determine that this action may be maintained as a class action with respect to a national class and with the subclass as asserted above, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate, and that the Court designate and appoint Plaintiffs to serve as Class Representatives and the undersigned counsel as Class Counsel;

B.   Declare the conduct of Defendants as alleged herein to be unlawful;

C.   Grant Plaintiffs and the other Class Members awards of actual and compensatory or other statutory damages or relief, in such amount to be determined at trial and as provided by applicable law;

D.   Grant Plaintiffs and the other Class Members restitution of all monies wrongfully obtained by Defendants;

E.   Grant Plaintiffs and the other Class Members pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

F. Grant Plaintiffs their costs of suit including reasonable attorneys' fees, and expenses, including expert fees, to the extent permitted by law; and

G. Grant Plaintiffs and the other Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs, individually and on behalf of class members, respectfully demand a

trial by jury on all of their claims and causes of action so triable.

Dated: December 9, 2015

**KANTROWITZ, GOLDHAMER & GRAIFMAN P.C.**

GARY S. GRAIFMAN
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
Phone: (845) 356-2570
Fax:  (845) 356-4335

**KEHOE LAW FIRM, P.C.**
John A. Kehoe
Two Penn Center Plaza, Suite 1020
1500 JFK Boulevard
Philadelphia, PA 19120
Phone: (215) 792-6676
Fax: (215) 792-6689

**PROFY PROMISLOFF & CIARLANTO, P.C.**
Joseph M. Profy
David M. Promisloff
Jeffrey J. Ciarlanto
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Tel: (215) 259-5156
Phone: (215) 600-2642

*Counsel for Plaintiffs*

33